ALICE TURNER, Appellee, v. THOMAS BENNETT, Appellant.

Automobile Accident: NEGLIGENCE: EVIDENCE. In this action for in-
1   jury to plaintiff because of the fright of her team at defendants
    automobile, the evidence of defendants negligence is reviewed at
    length and held insufficient to show negligence on his part in the
    operation of his machine, or in failing to have the machine lighted
    within the time required by statute, and that the verdict for plain-
    tiff was purely arbitrary.

Highways: USE OF SAME: RIGHTS OF PARTIES. The rights of an auto-
2   mobile driver and those of the driver of a horse to the use of the
    road are precisely the same, and neither should be held liable for a
    mere accident growing out of no fault of his.

*Appeal from Crawford District Court.*—HON. F. M. POWERS,
Judge.

THURSDAY, SEPTEMBER 25, 1913.

ACTION for personal injuries sustained by the plaintiff in
a runaway accident. The occasion of the accident was that the
plaintiff was riding in a buggy with her sister, Mrs. Meyers.
The team was nervous and somewhat afraid of automobiles.
The horses became frightened at an approaching automobile
which was about to meet them and whirled about in the oppo-
site direction, whereby both occupants fell out of the buggy.
The defendant was the owner and driver of the automobile.
There was a verdict and judgment for the plaintiff for $330.50.
The defendant appeals.—*Reversed and Remanded.*

*Shaw, Sims & Kuehnle,* for appellant.

*Harding & Kahler,* for appellee.

EVANS, J.—The accident occurred near the town of Deloit between 4:45 and 5:30 p. m., November 26th. The plaintiff and her sister were driving westerly toward the town. The defendant was driving from the town easterly. The traveled part of the road was somewhat narrow at the place of the accident, being sixteen or eighteen feet wide. The defendant first came into view of the team when he was three hundred feet or more distant therefrom. About ten rods in advance of the team at that time was a man on horseback. This was Patchin who appeared as a witness for the plaintiff on the trial. Patchin was also proceeding in a westerly direction. Because his horse was afraid of automobiles, he dismounted and led his horse to the south side of the road. The defendant thereupon bore to the north side to pass. He then turned immediately toward the south, running his automobile into some brush and against a bank on the south side, where he stopped. The effect of this movement was to give the team the benefit of practically all the traveled road. The team, however, preferred the other direction and almost simultaneously with the defendant's movement it whirled about in retreat. According to the testimony on behalf of the plaintiff, the team was thirty or forty feet distant from the automobile when it whirled away. According to testimony on behalf of the defendant, the distance was considerably greater.

I. The appellant has directed his principal argument to the proposition that the verdict is not sustained by the evidence in that there was no evidence of negligence on the part of the defendant. In view of our conclusions thereon, this contention necessitates our setting out a considerable part of the testimony.

1. AUTOMOBILE ACCIDENT: negligence: evidence.

The grounds of negligence charged in the petition are:

That the defendant was operating his automobile at a high and dangerous rate of speed; that he was operating his said machine without having any lamps lighted thereon; that he failed to stop his machine upon a signal from the plaintiff

while the team was at a sufficient distance from the machine to avoid the accident; that he failed to stop his said machine when he saw or should have seen from a distance that the team was restive and frightened; that well knowing that the team was afraid of autos, and seeing the perilous position in which the plaintiff was placed, he failed to stop his machine and avoid the accident; that he negligently, carelessly, and unlawfully attempted to pass the team on the right side thereof instead of on the left; that he negligently, recklessly, and wantonly approached the team on the north side.

These grounds were all denied by the answer.

There were six eyewitnesses to the accident. Three of them testified on behalf of the plaintiff and three on behalf of the defendant.

As to the immediate circumstances of the accident, Patchin testified for plaintiff as follows:

When I first saw it I didn't notice it was an auto but saw afterwards that it was. I was probably three hundred feet from it at the time. As near as I could tell, the auto was coming at a moderate rate of speed; I suppose about ten or fifteen miles an hour. It came up pretty quick. I don't know how fast it was running. I think it ran a little slower as it came up to where I was. I was off from my horse then. The auto was coming right by the side of me and the horse was on the side of the road. I got off because my horse was afraid of autos. When I turned out and got off from my horse I suppose the plaintiff, Mrs. Turner, was maybe ten rods behind me. When the auto came up to me in the road, she was thirty-five or forty feet behind me. I saw the horses turn around and upset the buggy at the time when the auto was from thirty to forty feet from the horses. The engine was running all the time. The defendant stopped the engine when we went to take the other horses by after they were caught five or ten minutes afterwards. When the buggy upset, I saw Mrs. Meyers and Mrs. Turner thrown out. Mrs. Meyers was driving. She sat on the right-hand side. I saw the buggy twice behind me after I first noticed the auto and before the team ran away. When I first looked at the buggy I didn't know that it was an auto coming. It must have been coming up the hill at that time, quite a ways from the buggy. The next

time was before the auto scared the horses, just before I got off from my horse. The auto must have been one hundred feet away from me when I got off my horse. . . .

(Cross-examination) : . . . Where I turned in there was nothing but brush. There was nothing but brush between the auto and the buggy. I saw the auto when it stopped. It stopped at one side of the road in the edge of the brush. There were trees at the side of the road but in front there was just brush. There were no trees where the team stopped, just at the edge of the main traveled part of the road. I didn't know Mr. Bennett when I first saw the auto. Didn't recognize it as his auto. Had known him before that. Don't know how many people were in the auto. Heard his wife talking and saw her. I went back after Mr. Bennett did. I think he was the first one up there. He left his auto by the roadside and ran down to where the ladies were in the road, about thirty or thirty-five feet. Have never stepped or measured that distance. Never had occasion to go over it or notice how far it was. Do not think it was as far as twenty-four steps. As I turned around to look back I didn't see anybody with hand up. Did not hear any signal nor any one cry out to stop. The team was turning when I looked, rearing back and swinging around. The first time I looked around the team was back a quarter of a mile or so. . . . The auto stopped opposite to where I was holding the horse. Don't know why he stopped there. The auto stopped before the team whirled. That was just the time I looked. I looked around just as the auto was stopped. I got off my horse because I was frightened, because I had a runaway horse that would scare at automobiles, and I knew that before I started to go on that road. The auto slowed down a little as it came up to where I was. . . . The team, as I saw it, was on the same side of the road that the auto was on, and they made him turn to the right. The team and buggy and myself and the auto were on the same side of the road at the time the team whirled and turned back. I went past the auto through the brush on the south side. I didn't see the team until I saw the team turning around. It may have been on the other side first. When I saw the team they were both on the same side of the road; the team had whirled and was running back. The auto was on the south side of the road going east when it stopped. The team must have been on the south side of the road when the auto stopped. The team was rearing back and getting ready to run when I

saw it but had not turned. The road was at their right. The driver was on the side next to the road. The team turned north and threw the buggy across the road on the north side and ran down the road back towards home. The team did not turn around to the south.

(Redirect examination) : The last I saw of the ladies they were driving the team in the road. The auto came up and went around towards the north side of the road to let me go by. I could not tell you whether these women were always on the north side of the road, but I did not see them there. When the auto passed me it went to the north side of the road, then came back to the south side and stopped. The team was on the same side that I was. Mr. Bennett turned around to the north side to get by me, circled out a little around me, and then went to the south side of the road, and the team was on the south and faced toward the north and ran over there.

Mrs. Meyers, plaintiff's sister, testified in her behalf as follows:

Remember the occasion of driving a team of horses and a buggy in which Mrs. Turner was seated with myself. The horses were somewhat afraid of autos. Had been in the habit of driving this team along the public highway around Deloit from the time we got them to that time. We had had the team about a year. Got them of Mr. Bennett, the defendant. I know Mr. Bennett. They were quite a lively team of horses. They had never ran away with me before. Had never met autos with them when I was driving them, but have when my husband was driving them. At that time they were shy a little. First saw the auto, at the time of the runaway, about half past five in the evening. It was crossing a culvert, as testified by Mr. Patchin. Didn't know it was an auto at that time. I think perhaps it was a little further than the length of this courtroom when I noticed it was an automobile. It was coming quite fast. I don't know whether it slowed up any until it got near the horses or not. I was driving the horses on this occasion, and my attention was taken up in looking at and managing the horses. When I first saw the auto I had the lines in both hands, and then I took the lines in one hand and reached for the whip to make them go by. Don't think the whole buggy could have gotten out to the

side of the road on account of the brush. The horses turned and threw us out; they pulled to each side and then turned. They seemed to be frightened and pulled to each side just as soon as the auto came in sight along the road. One pulled one way and one the other. We saw they were not going to pass at all. They held their heads up in the air. I held the lines tight and spoke to the horses. I don't know whether the auto was as far as the length of this room before the horses became restive and frightened.

(Cross-examination) : I was driving the team with the lines in my hand, sitting on the right side of the buggy. Held the team to the right side of the road. Did not stop the team; tried to get it to go on. That is the reason I reached for the whip. Had the whip in one hand and the lines in the other. At the time the team turned and ran back I was urging it forward when I saw the auto at some distance. I don't know whether the auto was on the left side of the road or not. Could see this man who had the horse ahead of me. He was on my left. I saw the auto still beyond the horses. This photograph marked Exhibit 2 looks a good bit like the road there as I was driving along that day. I don't know what became of the man with the horse after the auto came up to where the horses was. I was urging the team forward. Did not notice when the auto stopped. The auto was on the same side of the road with me when the team turned. Mr. Patchin was on the other side. The auto was directly in front of me and on the same side of the road and was still coming when the team turned, and I was still urging the team forward. Did not call out to the party ahead of me, nor did my sister. Didn't notice whether she raised her hand. We were frightened, and I knew the team was somewhat restless and easily frightened at autos. I intended to drive the team by the auto. My sister and myself got up on the wagon box full of straw and rode away with Mr. Imes. Don't know whether anybody assisted my sister in getting upon the wagon or not.

The plaintiff herself testified as follows:

Remember being on the public highway a couple of miles from Deloit on the afternoon of November 26th last year. Was with my sister who was driving a team and buggy. It was a cloudy afternoon or evening. Met the defendant driving

an automobile. First noticed the automobile coming toward us when it was near the bridge. Didn't know it was an automobile at the time because it was dark; never thought anything at all. I should judge it was about 5:30 in the evening. There were no lights burning on the auto. Did not hear any signal from the auto. Discovered it was an auto not very long after it passed that culvert. Between us and the culvert there was no curve, and the highway was very nearly level. When I first discovered it was an automobile it was farther away than the length of this room. I don't know how much farther. Mr. Patchin was ahead of us on the road on horseback. The horses became frightened before the automobile came up to us. I don't know how far away the automobile was at the time. They must have been further away than the length of this room. The horses held up their heads; one pulled one way and one the other. Then I held up my hand for the automobile to stop and kept up my hand until the team turned. I was on the left side of the road and held up my left hand. Don't know how far the auto was from us before the horses started to run away. I estimate the auto was about as far as to where that first row of men are sitting when the horses began to turn around. We were on the north side of the road at the time. The horses turned to the left. The automobile was coming on the north side of the road when I saw it; same side we were on. Next time I saw the auto after we were thrown out it was on the south side of the road. Between the time I last observed the auto, and when I got up from the runaway, the auto must have gone from the north side to the south side. The brush prevented driving the team to the side of the wheel track. My sister did not stop the horses. Don't know how she drove because I was frightened. The Patchin horse was jumping around. Don't know if the automobile slowed up. Don't remember hearing the engine. Heard no horn or any signal. I simply fell out from the buggy on the left side. My sister must have stepped out. It was too quick for me to jump out. Put my right hand down just as the buggy went over.

(Cross-examination) : Did not see the auto in the act of passing Patchin. I was watching the team. They were parting with their heads up. Don't remember whether they were still in the middle of the road or on the side of the road when the auto passed the man with the horse. Don't know when, with reference to the time that the auto passed the man and

his horse, that my sister pulled the team to the side of the road. She turned to the north and still kept urging the team along. I don't know that she had the lines in her left hand and the whip in her right hand. Was not looking at her. At the time she had the team on the side of the road they were prancing with their heads up and pulled apart a little. The team whirled shortly after the auto passed the man with the horse. I don't know how far my sister had driven the team after the auto passed the man in the road before the team turned. I don't know that she had gone a rod. The buggy was on the north side of the road when I put up my hand. Don't know where the man with his horse was at the time. Don't know how close the automobile was to the buggy when I put up my hand. I was seated on the left side of the buggy and put up my left hand about even with my head. Made no other signal. The auto was moving at the time and the buggy was moving. Put my hand up to stop the auto. I don't know whether the auto stopped or not until the buggy was turned over. After I got up I went down to where the auto was. Don't know how far it was, or whether Mr. Bennett came up to where I was. I was not unconscious. Don't know whether the man with the horse came up. Mr. Bennett's sister came up to speak with us. The auto was on the same side of the road we were when I raised my hand. It must have crossed over after we were upset. We found it on the other side of the road when we went down to where it was. Didn't see it as it was crossing the road. There was no brush or trees between me and the auto when I raised my hand. The auto did not stop when I raised my hand. Don't know how long I kept my hand up there. Didn't bring it down again until the team turned. I raised my hand while the team was on the side of the road, as we turned to the side. Don't know how far we drove the team along the side of the road. Could see the auto when she turned the team into the side of the road. She turned to the right to pass the auto. She turned on the same side that the auto was on when she turned. We were both approaching each other on the north side of the highway when I raised my hand. I raised my hand as we were turning into the side of the road. I don't know whether my sister drove ten feet along the side of the road. The horses had slowed down from a trot. Can't tell whether they went as far as ten feet or not after I raised my hand before they turned. After we had gone down by the auto, Mr. Bennett asked why somebody

didn't raise their hand.  When we were upset the team was on the south side.  My sister drove the team on the north side of the road in order to pass the auto.  We got over on the south side when the team turned.  The horses were loose from the buggy after the buggy turned.  I don't remember whether the auto was seventy-five feet from us when the horses turned.

It is contended in argument for the appellee that evidence of negligence is to be found in the testimony in behalf of the defendant.  We therefore set out the substance of such testimony as far as it relates to the circumstances of the accident.

The defendant's sister, Mrs. Woolsoncroft, who was riding with him on the front seat, testified as follows:

I sat on the front seat with Mr. Bennett and at his left. His wife and children were in the back seat.  There is a little curve in the hill coming up the hill from Deloit, just before you cross the culvert.  When the auto came to the culvert the women with the team seemed to be coming out into the open. I don't remember the man on horseback until after he got off from the horse.  I think it was about one-eighth of a mile from this culvert up to where this team was when I saw it first.  The machine whistled just as we were crossing the culvert.  Then Mr. Bennett slowed down his machine.  Remember passing the man with the horse.  Didn't see him get off.  He was on the south side.  There was a little brush there.  Mr. Bennett drove the machine to the left of the horse.  Swung to one side not so very much out of the road.  Then he swung back onto the right side of the road.  As he passed the horse the buggy and team were quite a ways ahead of us.  Mr. Bennett stopped the machine when he got on the right side.  It was about seventy or seventy-five feet, somewhere along there, from the place where the team turned to where the auto stopped.   .   .   .

(Cross examination):   .   .   .   After passing the man on horseback my brother went to the south side of the road and stopped and the team was on the north side.  We stopped there for a little while and all at once the horses whirled and ran away.  His auto was from seventy to seventy-five feet away at the time from the team.  The team was coming along quietly, showing no more signs of being restive or frightened than picking up their ears; and all at once they whirled from

the north side of the road and came over to the south side ahead
of the automobile. It was all unexpected to me. They didn't
run towards the auto. They just whirled around and ran back
the way they had come.

The defendant's wife testified as follows:

I saw a team coming just around the curve. When I saw
them they were in plain view from the auto. By the time we
came up to where the man on the horse was could see there
were two ladies with the team. Just as my husband with his
auto passed the man with the horse he turned to the north side
of the road. After he passed the man he turned back into the
south side. The team turned to the north side of the road. I
didn't know the team was the team that my husband had pre-
viously owned, but it looked like it. I don't think that the team
was restless or frightened before they whirled, except they
picked up their ears and held up their heads. I didn't see the
ladies make any sign. The team was coming along when it
whirled and turned. I was watching them. Saw the ladies as
they were thrown out of the buggy. The front part of the
buggy dropped down. They fell on the left side of the buggy.
We were seventy-five or eighty feet from the team at the time
it turned. Mr. Bennett brought his auto to a stop when the
team turned. From the time of his stopping the auto he didn't
have any opportunity to get out and go toward the team before
the team turned and whirled.

The defendant testified as follows:

Just as soon as I got around the bend so I could see the
road I saw a man on a horse. When I came up on the culvert
I could see this man and blew the whistle. He was fifteen or
twenty rods from me. He got off his horse at the south side of
the road. As I came up to him I swung a little to the north.
After I had passed him I pulled to the south side of the road
and stopped the machine, very nearly immediately, when I
had gone behind the man. First saw the buggy and team
when I was there at the culvert. They were at the other turn
coming out of the timber. They had come into full view.
Didn't know who they were when I first saw them. The team
was out at one side of the road when I recognized the fact

that it was a team driven by a lady. They never stopped their team to my knowledge. After I got past the man on horse I recognized the team as a ball-faced team I used to own and knew they were easily frightened. I pulled into the side of the road and stopped my car and they drove onto me. Neither one of these women, so far as I could see, had her hand up or made any signal. If there had been a hand up or signal made I was in a position to see it and was looking and I sure would have seen it. When I stopped the machine the team was still moving toward me. I stopped before the team a minute or two. I didn't time myself. I was watching the team. I was in a sense timing myself too. I couldn't tell really how long it was to the second, as I was watching the team and the ladies. I know how far away from me the team was when they whirled because I stepped it the following Monday with Mr. Robinson. The accident was on Saturday evening. . . .

(Cross-examination): . . . When I came to this man with the horse I turned to the north side of the road. I didn't stop when I saw this man because he didn't signal me to stop. I did not notice that his horse was frightened. I expected to pass the team. I saw the team along the side of the road before I came up to the man with the horse and knew that the team was on the north side of the road. I went over towards the same side of the road where the team was. The traveled part of the highway was about sixteen or eighteen feet wide.

If there is any evidence of negligence in the record, it must be found in the foregoing quotations. For the purpose of analysis we may direct our attention first to the query whether this evidence discloses any affirmative act on the part of the defendant which could be deemed actionable negligence. It will be noted that little information can be obtained from the testimony of the plaintiff and her sister. This is doubtless accounted for by the excitement of the moment and not to a lack of candor on the part of the witnesses. The testimony of Patchin is quite clear. Although the petition charged that the automobile was operated at a high and dangerous rate of speed, no evidence was adduced to that effect, and such claim

is not now pressed. The only affirmative act of negligence urged in argument of the appellee is that defendant was coming down the road on the north or left side thereof, whereas he should have taken the south or right side thereof. It seems to be assumed in argument that this was a violation of the statute and was therefore negligent. It is clear, however, that no violation of the statute was shown. Under the statute the defendant was bound to turn to the right and to give the team half the road when he should meet it. The fact that he occupied the middle of the road, or even that he swerved to the left before the meeting point was reached, was not a violation of the statute. This was not a collision resulting from a violation of the rules of the road. It is urged that the defendant was approaching directly toward the team and that this caused their fright. But he was necessarily approaching toward them upon any part of the road. Of course it was not necessary for the plaintiff to prove a violation of the statute in order to show negligence on the part of the defendant. He might have so used the road as to be deemed negligent, even though he had violated no statute. Looking at the question from such angle, the circumstances attending his swerving to the north are undisputed. Patchin on horseback preceded the plaintiff and her sister going in the same direction. The defendant necessarily met him first. The horse being frightened, Patchin dismounted and led him to the south side of the road. Under the statute, Patchin ought to have taken the north side of the road. He did not do so. The defendant, however, having observed his position, owed him the same duty of care to avoid the accident as if he had taken the proper side of the road. Defendant, therefore, necessarily swerved to the north to get safely by Patchin. He still had sufficient time and room to turn to the right and to give the team one-half the road. He did in fact turn across the road to the south and did give the team practically all the traveled road. According to the plaintiff and her sister, the team had shown fright while the automobile was at some distance down the road, and whirled about just before the plaintiff turned to

the right.   According to Patchin, they whirled immediately
after the defendant had turned to the right.   Clearly the first
fright of the team upon the distant approach of the automo-
bile was not attributable to any wrongful act on the part of
the defendant.   It is just as clear that it was his duty to adapt
himself to the position taken by Patchin with his horse.

Was the defendant guilty of negligence in the negative
sense in that he failed to do something which under the cir-
cumstances he ought to have done to avoid the accident?
It is first urged that he ought to have carried lights and
failed to do so.   It is urged that the time was more than one
hour after sunset and that he was required by the statute
to carry lights after such time.   Witnesses for the plaintiff
estimated the time at about 5 or 5:30.   Witnesses for the
defendant testified that they started from Deloit at 4:45 by
the watch and the accident occurred within four or five min-
utes after.   On the date mentioned the sun set at 4:31 sun
time and at 4:52 standard time.   No lights were due, there-
fore, under the statute until 5:52.   The defendant asked an
instruction to the jury to that effect, and we think it ought to
have been given.

There is the further consideration that the absence of
lights sustained no causal relation to the accident.   It was not
caused by the failure to see or discover.   The horses were
frightened because they did see and saw afar.   The presence
of dazzling lights would manifestly be more liable to increase
than to allay their fright.   It is also urged that the defendant
could see that the horses were afraid and that he ought to have
stopped.   He did stop.   But it is urged that he ought to have
stopped sooner, and this is the only possible point in the case
in support of the verdict.   He did stop immediately after he
passed Patchin.   When Patchin dismounted and took his posi-
tion on the south side of the road and in effect invited the
defendant to come forward, the defendant was one hundred
feet distant.   If it was the duty of the defendant to stop
sooner than he actually did, then it was his duty to do so at
or near such point before he came in close proximity to

Patchin's frightened horse. At this time plaintiff and her sister were at a still greater distance than Patchin. Does the testimony show such an exhibition of fright on the part of the horses at or near this time as to warrant a jury in saying that the defendant ought to have then stopped? We have read and re-read the evidence and we find nothing to warrant such a finding by the jury. The verdict against the defendant was purely arbitrary and must have been induced by eloquence of argument rather than by consideration of the evidence. In this aspect of it, the case is quite similar to *Raber v. Hinds,* 133 Iowa, 312; *House v. Cramer,* 134 Iowa, 374. .

The real manner and cause of this accident stands out quite prominently in the record. The reins in the left hand of an inexperienced woman furnished poor control of a nervous team that was afraid of an automobile. Fortunately the injury to the plaintiff was very slight. It consisted of a slight bruise of the hip which resulted in some discoloration, but all of which passed away before Christmas. She incurred an expense of $5.50 for one visit of a doctor. The jury allowed her this sum and the further sum of $325 for pain and suffering, including nervous shock. The extent of the pain was described by the plaintiff in her testimany as "rather an aching pain. . . . I felt pain in the abdomen and in the left side that same night. Could not tell the extent of that pain. It was not very severe." We are not called upon to pass upon this feature of the case. We think the defendant was entitled to a directed verdict on the ground of lack of evidence of negligence. This conclusion renders it unnecessary to consider other specifications of alleged errors.

We are not disposed to open the door of mitigation to heedless conduct on the part of any automobile driver. In

2. HIGHWAYS: use of same: rights of parties.

an emergency it is often true that he has the advantage over the driver of the horse. But the right of each to the use of the road is precisely equal to that of the other. Neither can be held liable

for a mere accident occurring through no fault on his own part.

The judgment below must therefore be reversed and remanded for further proceedings consistent herewith.— *Reversed and Remanded.*